No. 80,599

In the Matter of SALVATORE A. SCIMECA, *Respondent.*

(962 P.2d 1080)

Opinion filed July 10, 1998.

*Marty M. Snyder*, deputy disciplinary administrator, argued the cause and was on the brief for the petitioner.

*Geary N. Gorup*, of Wichita, argued the cause for the respondent, and *Salvatore A. Scimeca*, respondent, argued the cause and was on the brief pro se.

*Per Curiam:* This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against Salvatore A. (Tim) Scimeca, of Wichita, an attorney admitted to practice law in Kansas. The Kansas Board for Discipline of Attorneys found that respondent violated a number of the Model Rules of Professional Conduct (MRPC), and respondent filed exceptions to the final hearing report, seeking modification of the sanction recommended by the panel.

A formal hearing before a panel of the Kansas Board for Discipline of Attorneys was held on October 23 and 24, 1997. The Disciplinary Administrator appeared by Marty Snyder, Deputy Disciplinary Administrator, and respondent appeared in person. The formal complaint filed against respondent by the office of the Disciplinary Administrator contained 12 counts. The first eight counts alleged that respondent charged various clients an unreasonable fee, in violation of MRPC 1.5 (1997 Kan. Ct. R. Annot. 289). In addition, there are allegations in these counts that he failed to refund expense deposits, MRPC 1.16(d) (1997 Kan. Ct. R. Annot. 324); failed to tell a DUI client that the client could have applied for diversion without an attorney, MRPC 1.16(d); failed to act with reasonable diligence and promptness in representing a client, MRPC 1.4(a) and (b) (1997 Kan. Ct. R. Annot. 282); failed to keep a client informed of the status and substance of her case, MRPC 1.4; endorsed checks so as to attempt to make an improper agreement that would prospectively limit his liability and engaged in

fraudulent conduct by charging fees after his representation was terminated, MRPC 8.4 (1997 Kan. Ct. R. Annot. 366). Count 9 alleged that respondent used a deceptive and fraudulent retainer agreement with clients, MRPC 8.4. Counts 10 and 11 alleged that respondent placed advertisements that did not contain the name of a lawyer who was responsible for the content, MRPC 7.2(d) (1997 Kan. Ct. R. Annot. 358). Count 12 alleged that respondent's conduct when discussing with the prosecutor and trial judge the sentencing of a criminal defendant he represented violated MRPC 3.5(d) (1997 Kan. Ct. R. Annot. 341), MRPC 8.2(a) (1997 Kan. Ct. R. Annot. 364), and MRPC 8.4.

The panel made the following specific findings as to respondent's retainer agreements:

"4. The Agreements provided for an attorney fee retainer in a specified amount and provided:

'This attorney fees retainer is a minimum fee and is not refundable. In other words, regardless of what happens in the above matter, this Attorney Fees Retainer is owed to Attorney.'

"5. The Agreement also generally provided for an expense retainer in a specified amount and provided:

'I understand and agree that once the above expense retainer is consumed, Attorney has the right to ask for and receive an additional expense retainer in an amount reasonabl[y] commensurate with the amount of additional expense funds needed to effectively represent Client. I understand and agree that should there be any funds left in this expense retainer at the conclusion of the above matter, that Attorney will return these funds to Client, if there are not attorney fees due in excess of the amount above attorney fees retainer.

'In the eventuality that there are such excess attorney fees due, Attorney may apply any remaining expense fees on said excess attorney fees.'

"6. The Agreements provided the following regarding attorney's rates:

'Attorney's hourly rate is $170.00 per hour for all types of legal activity including but not necessarily limited to the following: office conferences, research, telephone conferences with any person including client and other individuals, in-court time, travel time to and from any court appearances or setting, and depositions. Attorney's time shall be kept and maintained at minimum increments of ¼ hour.'

"7. The Agreements provided for separate billing for legal secretarial time as follows:

'Attorney's legal secretaries' hourly rate is $40.00 per hour for all types of legal secretarial activity including but [not] necessarily limited to office conferences and telephone conferences with any person including client and other

individuals. Legal secretaries' time shall be kept and maintained at minimum increments of ¼ hour.'

Notwithstanding this provision, Respondent did not routinely bill for secretarial time. However, as found below, the billing statements in the record do evidence occasional separate charges.

"8. Some of the Agreements provided for associate attorney time at an hourly rate reduced from that of Respondent and for legal assistant time. With respect to each such person, the Agreements provided that time 'shall be kept and maintained at minimum increments of ¼ hour.'

"9. Generally, Respondent requested payment of both the attorney fee retainer and expense retainer at the time of the execution of the Agreement. The attorney fee retainer generally was deposited to the Respondent's office account. The expense retainer was deposited to a trust account."

In several instances, the panel found the client was required to pay a nonrefundable retainer and/or a nonrefundable expense retainer. Most also signed promissory notes for the payment of the fee or expenses. Several complaints involved respondent's charging unreasonable fees to clients who were referred to him by the Lawyer Referral Service. Carolyn Woods was such a client.

"The Lawyer Referral Service required Respondent to provide an initial consultation for the first 30 minutes at a $15.00 flat fee. During the initial visit, Ms. Woods was given lengthy forms to fill out which took her 30 minutes to do. The forms required credit references, savings and checking account information and other information which was irrelevant to the representation. She indicated to Respondent's legal assistant that she was looking for an attorney who would take her case on a percentage basis. At the beginning of her interview with Respondent, she informed him that she had only $30.00 and that she could discuss her case with him in 30 minutes, since she had already gone over it with his legal assistant, and was hoping to be represented on a percentage basis. After a 1 hour and 15 minute conference with Respondent, Ms. Woods declined Respondent's offer to further investigate the case under proposed billing arrangements. Respondent, while Ms. Woods waited in his office, prepared a letter terminating representation, even though Ms. Woods had not retained Respondent. He billed her $210.00 for the consultation. She paid him the $30.00 which she had, and Respondent required her to sign an agreement to pay $180.00 at the rate of $25.00 every two weeks."

As to respondent's altercation with Judge Pilshaw, the panel found:

"The Honorable Rebecca Pilshaw is a district court judge in Sedgwick County. Respondent appeared before her representing an individual criminal defendant

who had been charged in the sexual assault of a six year old. Respondent's client [pled] nolo contendere to the charges, and the [S]tate proceeded to enter a recitation of the facts that would have been established had a full trial been held. Following Respondent's identification of an additional individual involved in the criminal conduct, Judge Pilshaw informed Respondent and his client of her intent to make an upward departure on the sentencing guidelines. Respondent attempted to argue and assert additional information on the record concerning the intent to depart three times after the judge announced termination of the hearing and that they were in recess. Within three to five minutes after the hearing, the judge's administrative [aide] informed Judge Pilshaw that Respondent wanted to meet with her in the presence of Ms. Margaret McIntire, the Assistant District Attorney. The judge agreed to meet with counsel in chambers. The judge explained her reasons for departure, and Respondent became very angry and irate. He was very loud and yelled at the judge concerning her behavior. The judge ordered Respondent and the district attorney to leave the office. Ms. McIntire departed, but Respondent, after starting to leave, pulled the office door shut with him on the inside of the office. He then became even angrier, was physically shaking, was red, and stood very very close to the judge, telling her that she was unfit to be a judge. The judge was convinced that she would be hit if Respondent did not leave the office. After being yelled at by Judge Pilshaw, Respondent eventually left. Judge Pilshaw's administrative [aide] observed part of the confrontation. Both she and the assistant district attorney testified consistent with Judge Pilshaw's recollections.

". . . Respondent neither confirmed nor controverted the testimony of the three witnesses. He testified to an absence of memory of the specific events to which the other witnesses testified. During the hearing, he apologized to each of the three witnesses who were involved in the incident. However, the Panel, based upon its observations of Respondent, find[s] the apologies not to be sincere. The apologies were made long after the incident in a setting where Respondent obviously believed he would benefit from having apologized. Respondent was not remorseful. Respondent failed to acknowledge the extent of his misconduct, apologizing for whatever conduct may have been perceived as objectionable to those involved. Respondent's request during the hearing that each of the witnesses forgive him for whatever may have been wrongful in his conduct and speech was inappropriate."

The panel reached the following conclusions:

Count 1   Respondent charged an unreasonable fee. MRPC 1.5(a).

Count 2   Respondent charged an unreasonable fee and failed to refund an unearned expense deposit. MRPC 1.15(b) (1997 Kan. Ct. R. Annot. 316) and 1.16(d).

Count 3    Respondent charged an unreasonable fee. MRPC 1.5.

Count 4    Allegations not supported by clear and convincing evidence.

Count 5    Allegations not supported by clear and convincing evidence.

Count 6    Allegations not supported by clear and convincing evidence, except that respondent billed the client for secretarial time. MRPC 1.5.

Count 7    Respondent charged an unreasonable fee. MRPC 1.5.

Count 8    Respondent refused to return advance payments of unearned fees, endorsed checks so as to attempt to make an improper agreement prospectively limiting his liability, and charged fees after his representation was terminated. MRPC 1.8(h) (1997 Kan. Ct. R. Annot. 301), 1.15, and 8.4.

Count 9    Respondent's attorney retainer agreement provided for nonrefundable retainers, charged for secretarial services, and used .25 hours as the minimum billing unit, which resulted in clients being charged for time not spent on them. In connection with the promissory notes he had clients execute, respondent violated disclosure requirements for consumer credit. Respondent "engaged in dishonesty, deceit, and misrepresentation regarding ethical billing practices when dealing with his clients, who were unsophisticated consumers." MRPC 1.5, 1.15, 1.16(d), and 8.4(a) and (c).

Count 10   Respondent placed an advertisement without the required attorney's name, but the panel regarded it as a mere technical violation. MRPC 7.2(d).

Count 11   Respondent placed an advertisement without the required attorney's name, but the panel regarded it as a mere technical violation. MRPC 7.2(d).

Count 12   Respondent "was verbally abusive, physically threatening, and utterly and completely disrespectful to Judge Pilshaw." MRPC 1.5, 1.8(b), 1.15(b), 1.16(d), 7.2(d), 8.2(a), and 8.4(c) and (d).

With respect to the sanction, the hearing panel found:

"Respondent has breached duties owed to his clients (by mishandling client property), to the general public (by engaging in conduct which was fraudulent), to the legal system (by engaging in improper conduct with respect to Judge Pilshaw), and to the legal profession (by violating ethical standards relating to advertising and fees). These violations are of varying degrees of severity. However, considering the violations as a whole and upon giving significant weight to the Respondent's violations of his duty to the legal system, the Panel finds that Respondent should be indefinitely suspended from the practice of law."

The ABA Standards relied on by the panel provided:

"Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." ABA Standards for Imposing Lawyer Sanctions § 4.12 (1991).

"Suspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client." § 4.62.

"Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system." § 7.2 (1992 amendments).

The panel found the following seven aggravating factors to be present in this case:

· prior disciplinary offenses in which respondent was sanctioned by published censure. The sanction was based upon violations similar to the ones in the present case.

· selfish motive

· multiple offenses

· refusal to acknowledge wrongful nature of conduct

· vulnerability of victim (unsophisticated consumers of limited means)

· substantial experience in the practice of law

· indifference to making restitution

The panel found the following two mitigating factors to be present:

· personal or emotional problems

· previous good character and reputation in the community

The panel concluded that the aggravating factors outweighed the mitigating factors. Providing further reasons for its concluding that respondent should be suspended, the panel added:

"Respondent's presentation and testimony was evasive, inconsistent, and not credible. Respondent's conduct during the hearing supports the Panel's decision that

Respondent should not be permitted the privilege of representing clients. Although the Panel concludes that disbarment could be sustained under the circumstances presented, the Panel declines to recommend this censure because of Respondent's mental illness and family circumstances."

With regard to the sanction of probation, which respondent seeks in this matter, the hearing panel stated:

"The Respondent proposed to the Panel a plan of probation. After hearing the evidence, the Panel concluded that Respondent's situation does not meet the standards for suspension of sanction as set forth in *In re Jantz*, 243 Kan. 770, 763 P.2d 626 (1988). There are no unique circumstances. Further, Respondent has not in the opinion of the Panel fully admitted his misconduct, either to his clients, to Judge Pilshaw, or to the Panel. In fact, despite prior disciplinary matters relating to very similar conduct, the prior findings of the Wichita Bar Association Fee Dispute Committee, and the advice of the Disciplinary Administrator's office, Respondent continued to attempt to defend his unethical conduct by testimony which was not responsive to the questions presented, inconsistent and lacked credibility. He made restitution of excessive fees and expenses only when required to do so. His apologies to Judge Pilshaw and others involved in that incident did not appear to the Panel to be sincere. Although Respondent has commenced professional counseling, which is continuing, the Panel concludes, based upon the testimony of Respondent's psychiatrist, that a significant period of time will pass before Respondent could be sufficiently recovered from his depression to engage in the practice of law without significant risk to his clients, the public, the legal system, and the legal profession. Respondent's depression significantly impacts most, if not all, aspects of his legal practice, and monitoring would, in the opinion of the Panel, be an insufficient safeguard."

According to respondent, he took 19 exceptions to the panel report, which we will address.

The hearing panel made the following finding of fact:

"20. At the hearing, Respondent offered the testimony of Abdul Wadud, M.D. in support of mitigation and his proposed supervised plan of probation. Respondent has been a patient of Dr. Wadud since January 25, 1997, but has known Respondent since February 28, 1992, when Respondent's son needed psychiatric help. Dr. Wadud explained his diagnosis of Respondent's depression, the medication he prescribes for Respondent, and the course of treatment. *Dr. Wadud declined to testify that the major depression caused the incident with Judge Pilshaw.* According to Dr. Wadud, Respondent needs at least another two to three years of intensive therapy and continued medication." (Emphasis added.)

Respondent takes exception to the italicized portion of the above finding of fact.

The hearing panel's finding is correct in that Dr. Wadud shied away from the word "caused." The gist of his testimony, however, was that respondent was suffering from serious depression at the time of the incident and that a depressed person is apt to act in socially unacceptable ways due to reduced social and self-awareness. He also testified that one of the ways respondent typically manifested his diminished awareness was by getting "right in your face."

The panel's "half-empty" view of the psychiatrist's testimony may have been caused by respondent's raising expectations too high. In introducing his witness, respondent told the panel that one of the purposes for which Dr. Wadud's testimony was being offered was "the cause of the incident with Judge Pilshaw."

In a letter to this court, which is dated April 20, 1998, Dr. Wadud stated:

"The Hearing Panel did not understand my presentation on depression and assumed that the depression was not the cause of his behavioral problems. I did not decline to say that major depression caused the incident with Judge Pilshaw. As a matter of fact, his major depression **DID** cause this incident with Judge Pilshaw. If Mr. Scimeca were not depressed, this would **NOT** have happened. I also believe that if he were not depressed for such a long time, he would not have gotten himself in financial and legal predicaments."

Respondent also contends that the panel misconstrued the testimony of Dr. Wadud on whether respondent is fit to continue practicing law. Although not clearly specified by respondent, it appears that the following portion of the panel's conclusion is what he complains of:

"Although Respondent has commenced professional counseling, which is continuing, the Panel concludes, *based upon the testimony of Respondent's psychiatrist,* that a significant period of time will pass before Respondent could be sufficiently recovered from his depression to engage in the practice of law without significant risk to his clients, the public, the legal system, and the legal profession." (Emphasis added.)

The Disciplinary Administrator contends that "respondent's lack of recollection and insight regarding the treatment of his clients and Judge Pilshaw by the date of the hearing were the basis for the panel's determination that he is unable to practice law cur-

rently." The portion of the panel report that is quoted in the preceding paragraph, however, shows the panel's reliance on Dr. Wadud's testimony.

Dr. Wadud testified that at the time of the hearing, he saw no reason why respondent could not practice. In his opinion, respondent needed to continue therapy and needed some supervision. With continued therapy and some supervision, he would be capable of carrying out his professional responsibilities. Dr. Wadud recommended that respondent "continue his treatment for at least two to three years."

The panel's conclusion cannot reasonably be drawn from Dr. Wadud's testimony. If there is other evidence in the record that would reasonably support it, the Deputy Disciplinary Administrator has not brought it to our attention.

Respondent next contends that the panel misconstrued his testimony in finding that his apologies at the hearing were not sincere, that he was not remorseful, and that he failed to acknowledge the extent of his misconduct, apologizing for whatever conduct may have been perceived as objectionable to those involved. Respondent complains of the following finding from the panel report:

"22. Respondent neither confirmed nor controverted the testimony of the three witnesses. He testified to an absence of memory of the specific events to which the other witnesses testified. During the hearing, he apologized to each of the three witnesses who were involved in the incident. However, the Panel, based upon its observations of Respondent, find [*sic*] the apologies not to be sincere. The apologies were made long after the incident in a setting where Respondent obviously believed he would benefit from having apologized. Respondent was not remorseful. Respondent failed to acknowledge the extent of his misconduct, apologizing for whatever conduct may have been perceived as objectionable to those involved. Respondent's request during the hearing that each of the witnesses forgive him for whatever may have been wrongful in his conduct and speech was inappropriate."

The event in question is respondent's conduct toward Judge Pilshaw. The three witnesses who testified at the hearing about the incident were Judge Pilshaw, Laura Roberts, who is the judge's administrative assistant, and Margaret McIntire, the prosecutor. The incident occurred in February 1997; the hearing took place 8 months later in October 1997.

Respondent apologized to Judge Pilshaw and McIntire during his opportunity to cross-examine them, and his apology to Roberts also was made during the hearing and transcribed. The apologies are quite lengthy.

Respondent asked Judge Pilshaw and McIntire to forgive him, and the panel expressed its belief that the requests were inappropriate. Under the circumstances, not only in public but during a hearing convened for the purpose of determining whether respondent's conduct warranted sanctions, Judge Pilshaw and McIntire might have found it awkward to refuse. Contrary to the panel's finding, however, it does not appear that respondent asked Roberts to forgive him.

The verifiable aspects of the finding appear to be accurate. The aspects of the finding that respondent most strenuously objects to, however, cannot be verified from a transcript. The panel concluded, "based upon its observations of Respondent," that the apologies were not sincere. The panel also was of the opinion that respondent "was not remorseful."

Respondent contends that the panel erred in finding "[t]here is clear and convincing evidence that Respondent engaged in dishonesty, deceit, and misrepresentation regarding ethical billing practices when dealing with his clients, who were unsophisticated consumers."

The unethical billing practices cited by the panel were (1) charging for secretarial time, (2) using .25 hour as a minimum billing unit, and (3) requiring nonrefundable retainer fees. The gist of respondent's argument with regard to these practices is that he was unaware that they might constitute ethical violations.

(1) "Respondent, at the time that the secretarial billing language was in the Attorney Fee Retainer Agreements, was unaware that such language and even collecting for such services was per se unethical in Kansas." He points out that he had not intended to deceive—that the fee agreement he asked clients to execute expressly provided for his charging for services of secretaries.

(2) Respondent states that he "had no intent to deceive or defraud" in using the .25 hour billing unit. Instead, he states, his "intention in billing .25 increments was not to bill for minimal

amounts of time." At the hearing, respondent testified, "I know that there are many, many attorneys, many firms that bill at a quarterly hour, because I've discussed this matter with other attorneys." In answering follow-up questions, however, he conceded that he knew of no one who was currently using .25 hour increments.

(3) Respondent asserts in his brief that he has eliminated the nonrefundable language with regard to the retainer fee. An attorney retainer agreement without the nonrefundable retainer fee provision was admitted at the hearing by stipulation of the Disciplinary Administrator. Respondent points out that neither rules nor case law expressly prohibit nonrefundable retainers. It should be noted, however, that he stipulated at the hearing "that nonrefundable unearned retainers are prohibited by the Kansas Comment to Rule 1.5 and by Rule 1.16(d)." Finally, he emphasizes that he never intended "to keep an *unearned* fee." (Emphasis added.) He asserts that in "the exercise of good judgment" he would decide whether a retainer fee should be refunded. The examples he gave of instances when "good judgment" would dictate refunding the fee were when the client decided, before respondent had spent any significant amount of time on the matter, not to pursue it. In such cases the refund would be "the full retainer less whatever actual time" he had spent on it.

Respondent claims the panel erred in finding that he billed a client, Ms. Phillips, for services subsequent to termination by the client and that conduct was fraudulent, in violation of MRPC 8.4(c). At the hearing and before this court, respondent maintains that he had no intent to defraud the client. At the hearing, he said that he was entitled to a $5,000 fee because the agreement provided for a minimum fee of $5,000. He was unable to point to any language in the agreement, though. According to respondent, because charges "billed" after Phillips terminated his representation did not increase the total amount to more than $5,000, they were irrelevant to the amount of the fee owed by the client. With regard to post-termination expenses being billed to the client, respondent testified, "[T]he only explanation I have is probably what happened was there was delay of posting of certain expenses." He further testified that the client was not billed for the expenses.

Respondent states that he did not know better: "[T]here was no intent to defraud Ms. Phillips as of [sic] these additional expenses were incurred primarily, if not all, in connection with wrap-up matters. . . . [I] . . . thought that [I] could charge for necessary wrap-up expenses even after termination . . . ." He further states that now he realizes that such charges are improper, and he "did agree to send a refund check on the attorney fee retainer of $475.00."

Respondent complains of the panel's finding that the following aggravating factor applies to this case: "Refusal to Acknowledge Wrongful Nature of Conduct. Despite Prior Discipline and Arbitration Panel Decision, Respondent Continues to Fail to Acknowledge the Wrongful Nature of His Billing Practices."

Respondent contends that he has made changes in his billing practices and that his making those changes is evidence that he recognized the problems. He lists six improvements he has made:

He removed the following provisions from his fee agreement form:

1. Nonrefundable attorney fee.
2. Fee for secretarial time.

The form of retainer agreement that respondent offered into evidence does not contain either of the provisions mentioned. The exhibit was offered and admitted at the beginning of the hearing as part of a stipulation. Respondent does not direct the court's attention to any testimony about the agreement form.

3. Respondent testified that if the change could be accomplished using his existing computer system, he would switch from .25 to .10 hour billing increments.

He offered as his reason for doing so, not that he believed there was a problem with using the .25 hour unit, but that "I just don't want any questions raised about, you know, how much time was actually spent. I really don't."

4. He reduced the amount charged on hourly rate cases or cases where the retainer would not cover the fee.

Respondent testified that the nature of his practice kept him out of the office a good deal of the time so that he often did not care-

fully review billing statements. His remedy was to "try to make a reduction for most every client" in these categories.

5. He is using more flat, fixed fees.

6. He has adopted a final, follow-up appointment at no charge to the client to discuss client satisfaction and financial matters.

Respondent next complains of the panel's finding that the following aggravating factor applies to this case: "Indifference to Making Restitution. Respondent Resisted Complying With the Arbitration Orders Concerning Restitution."

Respondent asserts: "This finding is not supported anywhere in the record." Respondent was the only witness who testified on the subject of his billing practices and his response to arbitration decisions. He testified with regard to Shelley Herrington's fee complaint that he repaid her "within a reasonably short period of time" after the arbitration decision. The exhibits include two arbitration decisions, but there does not appear to be anything among the exhibits that would indicate how respondent responded to the decisions.

Respondent next complains of the italicized concluding remarks of the panel:

"Overall the factors in aggravation outweigh those in mitigation. *In addition, the Panel notes that Respondent's presentation and testimony was evasive, inconsistent, and not credible. Respondent's conduct during the hearing supports the Panel's decision that Respondent should not be permitted the privilege of representing clients.* Although the Panel concludes that disbarment could be sustained under the circumstances presented, the Panel declines to recommend this censure because of Respondent's mental illness and family circumstances."

Respondent urges the court to take into account the difficulties inherent in representing himself. Those difficulties, according to respondent, included intense examination by the Deputy Disciplinary Administrator, his inability to testify and take notes simultaneously, and having to do "on direct examination what his counsel would have done on cross-examination."

The panel noted elsewhere that respondent neither confirmed nor controverted the testimony of the witnesses to the incident with Judge Pilshaw. He suggests that this may be a source of the panel's negative impression of his hearing presentation, and he

asserts that it is not true that he neither confirmed nor controverted their testimony. The portions of the questioning and testimony he cites in support of his assertion concern which door in Judge Pilshaw's office suite was involved in the incident. The substance of the incident was his disrespectful and threatening conduct to the trial judge, not which door was being opened and closed. This argument tends to support the panel's impression of respondent's being evasive.

Respondent also raises the evidence of charging for secretarial time as a matter that may have raised the panel's concern about his credibility. He concedes that he testified that he had never charged for secretarial time, but there were exhibits that showed otherwise. He attempts to minimize the detrimental effect of this inconsistency by stating that his billing for secretarial time "occurred on an isolated basis." The evidence, however, showed that it occurred on an occasional, rather than on an isolated, basis. Moreover, the attorney fee agreement he had clients execute contained a provision for charging for secretarial time.

Respondent complains of the panel's conclusion that his conduct toward Judge Pilshaw violated MRPC 8.4(d). MRPC 8.4(d) provides, in part: "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice. . . ." Respondent contends that this rule does not apply to the incident with Judge Pilshaw because his "statements and misconduct occurred in Judge Pilshaw's chambers" rather than during a courtroom proceeding. Moreover, respondent's argument continues, there is no evidence that his client was harmed by the incident. In addition, respondent takes issue with the position stated at the hearing by the Disciplinary Administrator that his intent to intimidate and his intimidating Judge Pilshaw constitute conduct that is prejudicial to the administration of justice.

The Disciplinary Administrator notes that the annotations to Rule 8.4 do not contain any other cases involving verbal or physical threats against a judge. The Disciplinary Administrator also notes that most of the annotations are of cases involving "acts or omissions by an attorney resulting in prejudice to their client's legal matters." In the Disciplinary Administrator's view, nonetheless, it

simply is apparent that respondent's conduct was prejudicial to the administration of justice. The most convincing aspect of the argument is that respondent attempted to physically and mentally intimidate Judge Pilshaw *because of the duties she performed as a judge.*

Respondent also complains of the panel's denying his request for a continuance of the panel hearing to allow the in-person testimony of Charles D. Anderson, respondent's proposed probation supervisor. Respondent took exception to the panel's rulings set out in the following paragraph of its report:

> "Ms. Baker states for the record that Respondent moved for a continuance or, in the alternative, to recess at the conclusion of the hearing set for October 23 and 24, 1996, to allow in person testimony of Charles D. Anderson regarding Respondent's proposed probation plan. During a telephone conference with the Panel, Ms. Snyder, and Respondent, the request for continuance was denied and the Panel deferred ruling on the request to leave the record open to allow later testimony of Mr. Anderson. Before the close of hearing, the Panel denied Respondent's motion to take Mr. Anderson's testimony at a later date because of the Panel's conclusion that probation would not be considered in this case."

Respondent cites case law authority involving requests for continuances in civil and criminal trials. He relies on *State v. Jones,* 226 Kan. 503, Syl. ¶ 7, 601 P.2d 1135 (1979), for the proposition that it is an abuse of discretion for the trial court to refuse to grant a continuance so that the defendant could produce a material witness. In the present case, respondent sought a continuance so that he could produce Charles Anderson as a witness on the subject of supervised probation as the penalty for respondent's misconduct. *Jones* must be distinguished from the present case on the ground that the witness in the criminal trial was a material witness. In the present proceedings, the panel ultimately overruled respondent's request to leave the record open to accommodate Anderson on the ground that Anderson's testimony was irrelevant. A proposed plan of supervised probation was the only subject on which Anderson would have testified. By the time it had heard the other witnesses, the panel had concluded that supervised probation would not be an appropriate sanction. Thus, Anderson was not a material witness.

Respondent also contends that he should have been given an opportunity to produce Anderson as a matter of due process. He argues that the panel should not have concluded "even before the Respondent's all important closing argument" that probation was not a possible sanction. He cites no authority for the proposition. The panel's narrowing the possible sanctions after hearing all the "liability" witnesses and seeing all the exhibits does not constitute a deprivation of respondent's right to be heard.

Further, respondent contends that the sanction of indefinite suspension recommended by the panel is too harsh. It was the panel's opinion that disbarment would be an appropriate sanction for respondent's misconduct. It declined to recommend disbarment, however, "because of Respondent's mental illness and family circumstances."

The panel rejected the possibility of supervised probation as a sanction on the ground that "Respondent's situation does not meet the standards for suspension of sanction as set forth in *In re Jantz*, 243 Kan. 770, 763 P.2d 626 (1988)." In *Jantz*, the unique circumstances were as follows:

"The conduct complained of here took place within a very short period of time; there were no complaints against respondent prior to these incidents. These took place when respondent was under severe emotional distress, caused by the terminal illness of his father and his own financial problems. Mr. Jantz admitted his misconduct to the judge promptly. He has admitted the misconduct to his client and to the bar where he practices. He made prompt restitution of the funds, which were not at that time due the client but were paid by him into the hands of the clerk of the district court, to await further order of the court. By the time disciplinary proceedings were underway, Jantz had already made restitution, had commenced professional counselling (which is continuing), and had prepared a plan for retirement of his debts and financial obligations. We were told at the time of oral argument that he has made a substantial reduction of his obligations since the panel hearing in March of this year. His practice is growing, indicating that he is accepted by the members of the bench and bar as well as the residents of the community where he resides and practices." 243 Kan. at 774-75.

Jantz, on one single occasion at a very stressful time, committed a serious violation of a single client's trust. Jantz then admitted his mistake, made restitution, and took positive steps to alleviate and cope with the stressful elements in his life.

Respondent argues that he, too, has unique circumstances warranting probation and supervision. He urges the court to view the following as his unique circumstances: (1) he suffers from depression and is treating it; (2) he has filed personal and business bankruptcies; (3) his son suffers from a head injury; (4) he has apologized to Judge Pilshaw; and (5) the incident with Judge Pilshaw was an isolated incident.

What the court called "unique circumstances" in *Jantz* are circumstances from which it reasonably could be inferred that the attorney's misconduct was a one-time response to adversity and that it would be highly unlikely that he would repeat his mistake. The circumstances listed by respondent, other than the uniqueness of the incident with Judge Pilshaw, do not strongly suggest that his misconduct will not be repeated. Moreover, respondent has heavily edited his circumstances in coming up with the list, and some of the omitted circumstances are in high contrast with Jantz's circumstances. For instance, the panel found that respondent had engaged in professional misconduct on a number of occasions, in contrast with the single misdeed by Jantz. Notwithstanding that Dr. Wadud's testimony does not support the panel's finding that respondent was mentally unfit to practice law, the panel's rejection of respondent's proposal for probation is supported by the record.

Respondent also argues with the panel's statement that "[h]e made restitution of excessive fees and expenses only when required to do so." He directs the court's attention to his testimony about two instances in which he made refunds without the client's filing a complaint. He does not mention the instances in which clients filed complaints. Finally, respondent argues that there is ample precedent in the court's own opinions for ordering probation for him.

An attorney who receives advance funds belonging to a client, either as a fee or expenses, must keep those funds separate and not commingle them with other funds. The key question is whether an advance payment belongs to the client or the attorney. If the funds are paid to the attorney to be used for a specific purpose, they must be used for that purpose. In such a situation, the attorney acts as a fiduciary for his or her client. Where the funds are ad-

vanced by the client for costs or expenses, they must be kept in a trust account until used for those purposes. As noted in the ABA/ BNA Lawyers' Manual on Professional Conduct, pp. 45:109-11 (1998), the status of advance fees can be more complicated:

"The basic question is, Whose money is it? If it's the client's money in whole or in part, it is subject to the trust account requirements. If it is the lawyer's money, placing it into a trust account would violate the anti-commingling rule.

"In general, analysis turns on when the money is deemed 'earned,' for once money is earned it is the lawyer's. The majority of courts and ethics committees addressing the problem have looked beyond the terminology by which the fee is characterized, and have determined that fee advances are not earned when paid, and therefore must be deposited into the trust account. [Citations omitted.]

. . . .

"In the forefront of the debate on advance fee payments is the problem of the 'non-refundable' retainer. A non-refundable retainer 'allow[s] an attorney to keep an advance payment irrespective of whether the services contemplated are rendered.' *In re Cooperman*, 591 N.Y.S.2d 855 (N.Y. Sup. Ct. App. Div. 2d Dept. 1993). While widely used, this kind of arrangement is not immune to criticism.

"A retainer can serve one of two purposes, or some combination of the two. Either it is a fee paid in advance to ensure the lawyer's availability and to compensate the lawyer for forgoing [*sic*] the opportunity to be hired by the client's adversary—in effect, an option—or it is an advance deposit for fees not yet earned. It may also be a hybrid, and thus harder to evaluate.

"Many courts and ethics committees have held that payments made to ensure availability are indeed earned when paid, and therefore belong to the lawyer and are not subject to trust account requirements. [Citations omitted.]"

The parties stipulated before the panel that a nonrefundable unearned retainer is prohibited by MRPC 1.5. We agree. However, the Deputy Disciplinary Administrator would have this court, as a matter of public policy, require all fees advanced by a client to be refundable, regardless of how designated or agreed to by the parties. We decline to do so. The better view is to resolve the question based upon the agreement between the parties. If the contract or agreement between the attorney and the client clearly states that the fee advanced is paid as a nonrefundable retainer to commit the attorney to represent the client and not as a fee to be earned by future services, then it is earned by the attorney when paid and is the attorney's money. If, on the other hand, the retainer is to be

earned by future services performed by the attorney, then it remains the client's money and subject to MRPC 1.15.

Here, the agreement provided that the retainer was not refundable, was a minimum fee, and was owed to the attorney. Designating the advance fee as a minimum fee contemplates that it must be earned by future services to the client. Respondent had done nothing at that point in time for which the client "owed" him a fee. Absent clear language that the retainer is paid solely to commit the attorney to represent the client and not as a fee to be earned by future services, it is refundable. There was no such language in the agreements respondent entered into with his clients. The panel's finding that respondent's "non-refundable" retainer was a fee advanced for services to be performed, and thus subject to the trust account requirements of MRPC 1.15, is supported by the record.

We agree with the Deputy Disciplinary Administrator that billing for quarter hours is not a violation if that time is spent on a client's business. The violation is in not spending the time billed to the client on the client's business. Here, respondent clearly billed for time not spent in representing the client. He concedes that his billing practices were improper, and although he claims it was done in ignorance, it is nevertheless a violation of the MRPC.

Respondent does not take exception to the panel's finding that his conduct toward Judge Pilshaw violated MRPC 8.2(a). He does take exception to the panel's finding that his conduct violated MRPC 8.4(d) in that he "engage[d] in conduct that is prejudicial to the administration of justice."

It is not necessary for the improper conduct to occur in the courtroom. The proceedings in chambers are part of the administration of justice. The judge is no less a judge nor the proceeding no less judicial because it occurs in chambers. As stated in the ABA/BNA Lawyers' Manual, p. 101:504:

"Under Rule 8.4(d), a lawyer may be found to have engaged in conduct prejudicial to the administration of justice by behaving in a manner that is uncivil, undignified, or inappropriate. *See In re Holmes*, 921 P.2d 44 (Colo. 1996) ('undignified, offensive, threatening, and unprofessional' letters to opponents and court employees); *In re Stanley*, 507 A.2d 1168 (N.J. 1986) (rude stares at judge,

laughing, remarking in undertones, shaking finger at judge); *In re Moore*, 665 N.E.2d 40 (Ind. 1996) (on way out of judge's chambers, discussion of case became heated; lawyer responded to suggestion that he was not being truthful by grabbing opposing counsel's tie and to opponent's calling him name by hitting opposing counsel so hard it drove him across table); *In re McAlevy*, 463 A.2d 315 (N.J. 1983) (using obscenities in court).

"Such conduct may be deemed to violate the rule regardless of whether it directly interferes with a legal proceeding. *In re Keller*, 502 N.W.2d 504 (N.D. 1993)."

We have no difficulty finding respondent's conduct violated MRPC 8.4(d). It is this conduct which a majority of this court finds most egregious.

We find there is clear and convincing evidence establishing the violations determined by the panel. A majority of the court accepts the panel's conclusions and recommended sanction of indefinite suspension. A minority would suspend respondent for 1 year.

IT IS THEREFORE ORDERED that Salvatore A. Scimeca be suspended indefinitely from the practice of law in Kansas in accordance with Supreme Court Rule 203(a)(2) (1997 Kan. Ct. R. Annot. 201).

IT IS FURTHER ORDERED that Salvatore A. Scimeca shall make full restitution to complainants prior to the filing of a petition pursuant to Rule 219 (1997 Kan. Ct. R. Annot. 245) and that he comply with Rule 218 (1997 Kan. Ct. R. Annot. 235).

IT IS FURTHER AMENDED that the costs of these proceedings be assessed to respondent and that this order be published in the official Kansas Reports.