No. 87,896

In the Matter of KIMBERLEY K. KELLOGG, *Respondent*.

(50 P.3d 57)

Opinion filed July 12, 2002.

*Frank D. Diehl*, deputy disciplinary administrator, argued the cause, and *Stanton A. Hazlett*, disciplinary administrator, was with him on the formal complaint for the petitioner.

No appearance by respondent.

*Per Curiam*: This is an original proceeding in discipline filed by the Disciplinary Administrator's office against Kimberley K. Kellogg, of Leawood, an attorney admitted to the practice of law in Kansas.

The formal complaint filed against respondent alleges violations of KRPC 1.5 (2001 Kan. Ct. R. Annot. 345), fees; KRPC 1.15 (2001 Kan. Ct. R. Annot. 376), safekeeping property; KRPC 1.16 (2001 Kan. Ct. R. Annot. 387), terminating representation; and KRPC 8.4(c) (2001 Kan. Ct. R. Annot. 437), misconduct. Respondent filed an answer basically denying the allegations in the complaint.

The complaint filed against respondent grew out of her representation of Lyle McLane, III, and John Michael Curtis in 1999. McLane complained of respondent's failure to account for fees, lack of communication, and failure to represent him. Curtis complained of respondent's failure to communicate and to provide an itemized accounting of her services. The investigation of the complaints ultimately resulted in the filing of the formal complaint.

A hearing before the panel of the Kansas Board for Discipline of Attorneys was held on July 11, 2001, in the hearing room of the office of Disciplinary Administrator, Topeka, Kansas. Respondent appeared in person and by counsel, John H. Fields. As to the McLane complaint, the panel found, by clear and convincing evidence:

"2. On September 16, 1999, Lyle McLane, III, was arrested and held at the Johnson County Adult Detention Center. Thereafter, Mr. McLane's father, Lyle

McLane, Jr., retained the Respondent to represent his son. At the time he retained the Respondent, Lyle McLane, Jr. executed a written fee agreement. [1] Pursuant to the fee agreement, Lyle McLane, Jr. agreed to pay the Respondent a $20,000 flat fee, to be earned at a rate of $250 per hour. The agreement required Lyle McLane, Jr. to pay $2,000 initially. The agreement further established that the parties would schedule the remaining payments by September 27, 1999.

"3. On September 17, 1999, Lyle McLane, Jr. paid to the Respondent $2,000. Although the Respondent had not yet earned the fees, the Respondent did not deposit the $2,000 into a trust account.

"4. A few days later, Lyle McLane, Jr. terminated the Respondent. Thereafter, on October 14, 1999, Scott Wasserman provided written notification to the Respondent that she had been terminated and that he had been retained to take over the defense of Lyle McLane, III.

"5. On December 29, 1999, Lyle McLane, Jr. requested that the Respondent provide him with an accounting of the $2,000 and with a refund of unearned fees. The Respondent failed to respond to Lyle McLane, Jr.'s requests.

"6. At some point, the Respondent attempted to reconstruct the time she spent on the McLane matter.

"7. On April 18, 2000, Lyle McLane, Jr. filed a written complaint with the Disciplinary Administrator. In his letter, Lyle McLane, Jr. complained that he had never received an itemized accounting of the Respondent's time or a refund of unearned fees, as he had requested from the Respondent.

"8. The Respondent responded to Lyle McLane, Jr.'s complaint, asserting that she earned the $2,000 that had been paid to her."

As to the Curtis complaint, the panel found, by clear and convincing evidence:

"9. On April 11, 1999, John Michael Curtis, a high school teacher, learned that he was going to be charged with two felony counts of sexual misconduct involving a student. Thereafter, on April 12, 1999, Mr. Curtis hired the Respondent to represent him in the [defense] of that matter.

"10. To memorialize their fee agreement, Mr. Curtis executed a contract for services. [2] The contract provided the following term regarding attorney fees:

'Reasonable attorneys' fee for all services performed by said attorney on behalf of clients and by reason of clients' retention of said attorneys, said fee is now estimated to be $15-25,000 for which a partial retainer of $3000.00 is herewith

---

[1]  "The Respondent did not execute the fee agreement."

[2]  "Although the Respondent did not sign the 'Attorney's Contract,' a term of the contract provided, '[A]cceptance by attorneys of this contract shall be evidenced by commencement of performance of services.' "

paid. + 5000.00 to be paid on Thursday, Bondsman to receive 4000 of the 8000 for the bond.'

"11. On April 12, 1999, Mr. Curtis paid the to Respondent $3,000. Then, on April 16, 1999, Mr. Curtis provided the Respondent with two checks: check number 2107, in the amount of $12,000, made payable to the Respondent and check number 2108, in the amount of $5,000, made payable to Bud Keys Bonding Company. Finally, on May 11, 1999, Mr. Curtis provided the Respondent with two additional checks: check number 2124, in the amount of $10,000, made payable to the Respondent and check 2125, made payable to Scott Weichmann, in the amount of $1,000. In sum, Mr. Curtis paid to the Respondent $31,000. Of the $31,000, $5,000 was paid to the bondsman, and $1,000 was paid to an investigator. As a result, Mr. Curtis paid to the Respondent $25,000 in attorney fees.

"12. On the advice of counsel, on April 19, 1999, Mr. Curtis married his girlfriend, Patricia. The Respondent and her companion served as the witnesses at the courthouse ceremony.

"13. During the first three weeks after the Respondent was hired, Mr. and Mrs. Curtis were satisfied with the legal services that the Respondent provided.

"14. After the first three weeks of the Respondent's representation, the Respondent routinely failed to return telephone calls and canceled meetings with Mr. and Mrs. Curtis. After having a conversation with Scott Weichmann in June, 1999, Mr. and Mrs. Curtis began to be concerned about the Respondent's representation of Mr. Curtis. At that time, Mr. and Mrs. Curtis first requested that the Respondent provide an itemized accounting of the services the Respondent had provided. [3]

"15. In August, 1999, after being unable to maintain sufficient contact with the Respondent, Mrs. Curtis scheduled an appointment with the Respondent. At the time of the appointment, the Respondent was not present in the office. In her stead, Ms. Kelly [4] met with Mrs. Curtis. Ms. Kelly brought Mr. Curtis' file to a conference room and met with Mrs. Curtis. Ms. Kelly examined the file to determine the status of the Respondent's representation. At that time, Ms. Kelly told Mrs. Curtis that there was nothing in the file other than the documents Mr.

---

[3] "At the hearing on this matter, the Respondent testified that Mr. and Mrs. Curtis did not request an itemized accounting of their retainer until they terminated her on November 11, 1999. However, based upon all of the evidence, including the testimony of Ms. Needham, Ms. Kelly, Mrs. Curtis, and the Respondent, the Hearing panel finds the Respondent's testimony on this point lacks credibility."

[4] "Ms. Kelly, a trained paralegal went to work for the Respondent in April, 1999. During her employment with the Respondent, Ms. Kelly worked primarily on domestic relations cases. Ms. Kelly resigned her position with the Respondent on January 28, 2000.

Curtis provided the Respondent in April. Ms. Kelly was unable to tell Mrs. Curtis what had been done with the case since April, 1999.

"16. From October 14, 1999, through October 16, 1999, the Respondent attended a National Association of Criminal Defense Attorneys seminar in Las Vegas, Nevada. The Respondent billed Mr. and Mrs. Curtis for ten hours in attorney fees for 'conferencing' with other attorneys while at the seminar.

"17. During the second week of November, 1999, Mr. and Mrs. Curtis attempted to meet with the Respondent. However, a number of meetings were scheduled and then canceled by the Respondent. Eventually, Mr. and Mrs. Curtis met with the Respondent on the morning of November 11, 1999. During that meeting, the working relationship between Mr. Curtis and the Respondent broke down. At that time, Mr. Curtis terminated the Respondent and requested that he be provided with an itemized account of the time the Respondent spent working in his behalf. Additionally, Mr. Curtis asked for a refund of the unearned fees.

"18. The Respondent informed Mr. and Mrs. Curtis that their bill was not ready and that they should return at 4:30 p.m. to pick it up. Pursuant to the directions by the Respondent, at 4:30 p.m., Mr. and Mrs. Curtis returned to the Respondent's office. At that time, the door was locked and no one answered the door. Mr. and Mrs. Curtis waited for the Respondent. Eventually, approximately 30 minutes later, the Respondent returned to the office. Inside the office, the Respondent found a copy of Mr. Curtis' file, along with an itemized account. The Respondent then provided Mr. Curtis with the copy of his file and the itemized bill. The bill indicated that Mr. Curtis should received a refund of $5,038. However, the Respondent did not provide Mr. Curtis with a refund.

"19. At the hearing on this matter, the Respondent admitted that she did not make contemporaneous time records detailing the work she did on the Curtis case. . . .

"20. Ms. Needham [5] prepared the Curtis bill by examining the file and the daily calendar sheets. After she completed the bill, Ms. Needham provided the bill to the Respondent. Without examining the accuracy of the bill, the Respondent looked at the back page to determine the total amount earned. At the hearing on this matter, Ms. Needham testified as follows, when questioned by the Disciplinary Administrator:

---

[5] "The Respondent hired Ms. Needham in August 1998, on a part-time basis. At that time, Ms. Needham's last name was Hicks. Additionally, Ms. Needham is commonly known as Kitty. Thereafter, on June 25, 1999, Ms. Needham began working for the Respondent on a full-time basis. During her tenure with the Respondent, Ms. Needham did the billing and worked on some domestic relations cases. Although Ms. Needham had no formal training as a legal assistant or paralegal, the Respondent billed Ms. Needham's time as such. Shortly after Ms. Needham was asked to 'pad' the Curtis bill, Ms. Needham resigned her position with the Respondent."

'Q. Now, is this the original bill that you—that you put together for the Curtises?

'A. The original bill?

'Q. Yes?

'A. No. This is not—the bill they were given is not the original bill.

'Q. Does the original bill still exist?

'A. I do not believe so, no.

'Q. How did you prepare the original bill for the Curtises?

'A. The original bill was based on the sheets—the daily calendars that each employee kept. I would go through and put in each employee's time as to how much time they spent on a case and what they did for that case. So that's how it was generated.

'Q. And does this bill, Exhibit L, differ in some respect from the first bill that you put together?

'A. Yes, sir.

'Q. How does it differ, generally?

'A. Generally?

'Q. Yes.

'A. The original bill was a total of somewhere between 8 and $10,000. This bill is $19,962.

'Q. How did you arrive at that figure?

'A. I added on.

'Q. Now, the original bill, did you give that to the respondent for her review?

'A. She asked me how much the total bill was and I told her. She said, "That's not good enough, I only want to give them $5,000 back."

'Q. Did you have any reaction to that?

'A. I asked her how I was supposed to do that.

'Q. Any response?

'A. She said, "Add time." I said, "Where?" She said that she had gone to a conference out of the city, that I should include time for that. That there was a lot of research that she had done, I should add that. But that was I to prepare a bill that only gave them, $5,000 back.

'Q. Now, was there anything in the original notes that would indicate these out of town conferences and how much was to be billed for them?

'A. No.

'Q. Let's go to some specific items on Exhibit No. L. For instance, 4-12 (sic), there's a notation seven hours at $150 per hour. Where did you get that amount?

A. I added four hours. It was originally three.

. . . .

'Q. Did you do any research in the Curtis matter—or any research that was billed to the Curtises?

'A. Yes.

'Q. Do you know how much?

'A.  I have no idea.

'Q.  Okay.

'A.  I was working on an article that Ms. Kellogg wanted to have published. It was on sexual predators and I used that time against the Curtises. I mean, I put it on their bill.

'Q.  Was that—did that come about because you were—that you came up with it or did Ms. Kellogg?

'A.  She suggested it.

'Q.  By she you mean?

'A.  Ms. Kellogg, I'm sorry, yes, sir.

'Q.  Okay. Now, 4-15-99, does that entry differ from your original entry, if you know? Did you add any time to that one is what I'm asking?

'A.  I'm sure that I did. I had to add essentially $10,000 to their bill—over $10,000. I figured that out on my calculator last night. That's 66 hours that I had to add at $150 an hour.

. . . .

'Q.  Where did you get those hours?

'A.  I would have added on. Again, because it's research, it's preparing for the case, it seemed—when I had to add on it seemed the safest way to add on time because it wasn't something that could be verified.

'Q.  Were you ever, as an employee, aware of how Ms. Kellogg would have conducted research when she did any?

'A.  Other than working on her article for the NACDL I don't know of any research she did.'

Ms. Needham also testified that the Respondent asked her to 'pad' the bill on at least one other occasion.

"21. Regarding the same subject, Danielle Kelly responded to the Disciplinary Administrator's questions as follows:

'Q.  . . . Now, prior to the preparation of Exhibit L, was there any discussion in the office concerning the Curtis bill?

'A.  Prior to it being done?

'Q.  Yes.

'A.  Yes. Kitty had been working on it for a while, I think for a couple of days. She had completed it. She told me that she had completed it, and that Kimberley came in—

'Q.  Did you see the original bill that Ms. Needham had?

'A.  Yes.

'Q.  Or Ms. Hicks had?

'A.  Yes, mm-hmm. The original bill was around eight, $8,000 or $9,000. Kimberley came in to look at it. She looked, glanced at it, gave it back to Kitty and told her to redo it, she didn't want to refund more than $5,000. Kimberley left shortly after that, and Kitty came to me and said, "How am I supposed to bill for $15,000 more?" '

"22. Finally, the Respondent testified on direct examination by her counsel as follows:

'Q. Okay. Did you ever tell Kitty Hicks to make up or inflate any charges that went on to that bill?

'A. Never.

'Q. What did—there was a first draft, wasn't there?

'A. There may have been a—there was at least one first draft, I would say.

'Q. All right. Do you have any recollection as to the approximate amount of that first draft?

'A. No, I don't have any.

'Q. Was it $8,000 or $10,000?

'A. That's what I've heard everyone testify about, but I don't know.

'Q. Okay. And you just don't have any idea one way or the other?

'A. I don't.

'Q. Okay. What did you tell her after the first draft?

'A. That it wasn't complete, and that I didn't believe that I owed them more than $5,000.'

On this point, the Hearing Panel finds Ms. Needham and Ms. Kelly's testimony to be credible and finds the Respondent's testimony to be not credible.

"23. In January, 2000, while working on billing, the Respondent asked Ms. McRoberts to 'add more to' various bills. When Ms. McRoberts asked the Respondent what she meant by 'add more to it,' the Respondent eventually explained to Ms. Roberts that she wanted her to 'make something up.' [6]

"25. The Respondent billed in quarter hour increments whether or not the time was spent. In a memorandum from the Respondent to her office staff dated April 6, 1999, the Respondent stated:

'We need to make sure that we keep track of time and expenses so that we can accurately bill the clients. I have found the easiest way for me to do so is to note the time (and expenses) on my daily calendar. We bill in ¼ hours. Phone calls are always a minimum of a ¼ hour. A typed letter is at least ½ hour, a hand-written letter is ¼ hour. . . .'

"26. On November 12, 1999, Mr. Curtis filed a complaint with Missouri authorities regarding the Respondent's bill.

"27. It was not until December 10, 1999, that Mr. and Mrs. Curtis received a check in the amount of $5,038 from the Respondent. On that date, Mr. Curtis telephoned the Respondent's bank to determine whether the Respondent had sufficient funds in her account to cover the check. The Respondent did not have

---

[6] "Ms. McRoberts went to work for the Respondent during the later part of November, 1999, after the Curtis bill had been constructed and provided to Mr. Curtis. Ms. McRoberts was hired to handle the billing for the Respondent. Ms. McRoberts last day of employment came at the end of January, 2000."

sufficient funds in the account to cover the check. Mr. Curtis then went to the Respondent's bank; the bank again verified that the Respondent did not have sufficient fund[s]. At that time, the bank stamped the check 'NSF.'

"28. Mr. Curtis contacted the Johnson County District Attorney's office regarding the bad check. Mr. Curtis was provided with information on how to begin the collection process. Mr. Curtis sent the Respondent the appropriate notice regarding the bad check. Then, on December 17, 1999, the Respondent provided Mr. Curtis with a cashier's check in the amount of $5,038. Mr. Curtis deposited the cashier's check into his account.

### *"Trust Account*

"29. In May, 1999, the Respondent opened a trust account at Premier Bank, account number 1083368. The Respondent opened the trust account with Mr. Curtis' final payment, in the amount of $10,000. . . .

"30. On December 10, 1999, when Mr. Curtis presented the Respondent's check in the amount of $5,038 to her bank, the Respondent had only $4,330.70 in the account.[7] The balance in the Respondent's trust account fell below $5,038 on August 8, 1999.

"31. From the inception of this case, the Respondent has provided three explanations as to why the trust account check written to Mr. Curtis, received December 10, 1999, was not paid by the bank. Initially, the Respondent indicated that she did not know why the check was not paid. Then, during the Missouri proceedings, the Respondent testified that, because of the bank charges, there were insufficient funds in the account to cover the check. Finally, the Respondent reasoned that there were insufficient funds in the account because the Respondent made a math error having to do with a debit in the amount of $2,000. Certainly, the Respondent wrote a check in the amount of $2,000 in August, 1999. However, the Respondent never explained what she meant by 'math error.'

"32. On September 18, 2000, the Respondent appeared before the Fee Dispute Committee for the Kansas City Metropolitan Bar Association regarding the Curtis fee. During the course of the hearing, the Respondent agreed to refund an additional $10,000 to Mr. and Mrs. Curtis. However, following the hearing, the Respondent refused to provide such a refund, asserting that she was 'strong-armed' into making the agreement.

"33. On December 12, 2000, the Respondent issued a new invoice, claiming that Mr. and Mrs. Curtis were only owed $3,969.25, rather than the $5,038.00 previously refunded."

---

[7] "It is important to note that the funds in the trust account, during the time in question, did not all originate from Mr. Curtis. On August 16, 1999, the Respondent deposited $5,000 of someone else's money into the trust account. Then, sometime in October, 1999, at least one deposit was made. Finally, on December 16, 1999, the Respondent deposited $927.50 into the trust account so that the cashier's check to Mr. Curtis would clear."

The panel made the following conclusions of law:

"1. The Kansas Rules of Professional Conduct require that a lawyer's fee be reasonable. *See* KRPC 1.5(a).

"2. The question of whether attorney fees are reasonable also arises in contexts outside the disciplinary arena. Recently, in *Davis v. Miller*, the Kansas Supreme Court reviewed whether the award of attorney fees in a suit for fraud and breach of warranty, arising from a postnuptial agreement, was reasonable. In that case, the Court stated, '[f]ees which are not supported by "meticulous, contemporaneous time records" that show the specific tasks being billed should not be allowed.' 269 Kan. 732, 748, 7 P.3d 1223 (2000) (*quoting Case v. Unified School Dist. No. 233, Johnson Co.*, 157 F.3d 1243, 1250 (10th Cir. 1998).

"3. In this case, even if the Hearing Panel were to accept the Respondent's testimony, she estimated the time she spent working on the Curtis matter. She did not have any meticulous, contemporaneous time records that show the specific tasks being billed to the Curtises. The fee charged to the Curtises, $19,962, is unreasonable because the Respondent has no credible evidence to establish that she earned the fee. Accordingly, the Hearing Panel concludes that the Respondent charged Mr. and Mrs. Curtis an unreasonable fee.

"4. In addition to failing to have meticulous, contemporaneous time records, the Respondent also violated KRPC 1.5 by billing her client for time she did not expend. Ms. Needham testified that the Respondent billed a quarter hour for telephone calls, whether or not a quarter hour was spent on the telephone call. Additionally, Ms. Needham testified that she billed Mr. and Mrs. Curtis for time the Respondent spent at a continuing legal education conference in Las Vegas and time that Ms. Needham spent researching information for an article that the Respondent was attempting to have published regarding sexual predators. Billing in this fashion was addressed in *In re Scimeca*, 265 Kan. 742, 962 P.2d 1080 (1998).

'[B]illing for quarter hours is not a violation if that time is spent on a client's business. The violation is in not spending the time billed to the client on the client's business. Here, respondent clearly billed for time not spent in representing the client.'

*Id.* at 760. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 1.5 by billing for time that she did not spend on the Curtis matter.

"5. The Respondent violated KRPC 1.15 in several respects. KRPC 1.15 provides, in pertinent part, as follows:

'(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state of Kansas. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

'(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

. . . .

'(d) Preserving identity of funds and property of a client.

(1) All funds of clients paid to a lawyer or law firm, including advances for costs and expenses, shall be deposited in one or more identifiable accounts maintained in the State of Kansas with a federal or state chartered or licensed financial institution and insured by an agency of the federal or state government . . . .

(2) The lawyer shall:

. . . .

(iii) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accountings to the client regarding them.

(iv) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.'

"a. KRPC 1.15(a) and KRPC 1.15(d)(1) require lawyers to deposit retainers into an appropriate trust account. In regard to Mr. and Mrs. McLane, the Respondent violated KRPC 1.15(a) and KRPC 1.15(d)(1) when she failed to deposit their retainer into a trust account. Additionally, the Respondent violated KRPC 1.15(a) and KRPC 1.15(d)(1) when she failed to deposit $15,000 of the $25,000 paid by Mr. and Mrs. Curtis into a trust account.

"b. Lawyers must also appropriately safeguard client property, pursuant to KRPC 1.15(a). In this case, the Respondent provided Mr. and Mrs. Curtis with a refund check in the amount of $5,038, on December 10, 1999. At that time, Mr. Curtis contacted the Respondent's bank to determine whether the check would clear the Respondent's account. Mr. Curtis was informed that the check would not clear the bank. By failing to keep Mr. and Mrs. Curtis' unearned fees in the trust account, the Respondent failed to appropriately safeguard her client's property in violation of KRPC 1.15(a).

"c. The Respondent converted approximately $10,000 of Mr. and Mrs. Curtis' money to her own use. In so doing, the Respondent failed to safeguard her client's property in violation of KRPC 1.15(a).

"d. Lawyers must maintain records of trust account funds. In this case, the disciplinary investigator requested that the Respondent provide him with complete trust account records. The Respondent informed the investigator that she was uncertain whether she would be able to provide the requested trust account information. The trust account statement from October, 1999, was never pro-

vided. The Respondent failed to maintain complete trust account records as required by KRPC 1.15(a) and KRPC 1.15(d)(2)(iii).

"e. Ms. Curtis testified that she began requesting an accounting of the Respondent's time in June, 1999. However, it was not until after the Respondent's representation was terminated, on November 11, 1999, that the Respondent provided such an accounting. As such, the Hearing Panel concludes that the Respondent violated KRPC 1.15(b) by not providing the requested accounting during June-November 1999.

"3. According to KRPC 8.4(c), engaging 'in conduct involving dishonesty, fraud, deceit or misrepresentation' constitutes professional misconduct. In this case, the Respondent engaged 'in conduct involving dishonesty, fraud, deceit or misrepresentation' when she directed Ms. Needham to fraudulently 'add time' to the Curtis bill."

The panel applied the ABA Standards for Imposing Lawyer Sanctions (1991) and considered ABA Standard 3.0 in making its recommendation as to the discipline to be imposed against the respondent.

## The panel found the following aggravating factors:

"Prior Disciplinary Offenses. The Respondent has previously been disciplined. In 1997 and 1998, the Respondent was found in violation of four disciplinary offenses in Missouri. Additionally, on April 21, 2000, the Kansas Supreme Court placed the Respondent on probation for two years for having violated KRPC 1.1, KRPC 1.3, KRPC 1.4, KRPC 1.5, KRPC 5.3, KRPC 8.4, and Kan. Sup. Ct. R. 207. *In re Kellogg*, 269 Kan. 143, 152, 157-58, 4 P.3d 594 (2000).

"Dishonest or Selfish Motive. The misconduct in this case was motivated by dishonesty, selfishness, and greed. The Respondent decided that she did not want to refund more than $5,000 to Mr. and Mrs. Curtis. In order to effect the Respondent's intentional 'decision,' the Respondent directed her staff to 'pad' the Curtis bill. As a result, the Respondent's staff added between $10,000 and $12,000 in fees to the Curtis bill. It was a dishonest act to direct the preparation of a false bill and it was a selfish and greedy act to retain unearned fees.

"Pattern of Misconduct. The evidence in this case clearly supports a finding that the Respondent engaged in a pattern of misconduct. The testimony from Ms. McRoberts establishes that the Respondent continued to 'pad' her bills after the Curtis case. Additionally, there is evidence that a pattern of misconduct relating to billing started before the Curtis case. Ms. Needham testified that prior to 'adding to' the Curtis bill, the Respondent previously directed her to 'pad' another bill. In addition, there was a similar finding made in the Respondent's first disciplinary case. *See In re Kellogg*, 269 Kan. at 155. With regard to its conclusion that the Respondent violated KRPC 1.5 in the earlier disciplinary case, the Court stated:

'The evidence clearly showed a billing statement that was grossly inaccurate and excused by respondent as being prepared by a third party. This is not a valid excuse. Although the fee dispute was resolved by the bar-sponsored fee

resolution procedure, respondent's actions clearly show a violation of KRPC 1.5 . . . . The billing sent was excessive and contained admitted errors.'

"Multiple Offenses. By violating KRPC 1.5, KRPC 1.15, and KRPC 8.4(c), the Respondent engaged in multiple offenses.

"Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process. The Hearing Panel concludes that the Respondent's testimony at the hearing was less than forthright and, as shown by the Findings of Fact, not credible on some issues.

"Refusal to Acknowledge Wrongful Nature of Conduct. The Respondent admits that she should have had sufficient funds in the trust account to cover the check. However, the Respondent has refused to admit any other wrongdoing in this case. Respondent has belatedly admitted in Defense Exhibit 48 that her internal procedures for her practice were less than perfect.

"Vulnerability of Victim. Mr. and Mrs. Curtis were particularly vulnerable. Mr. Curtis was a high school teacher charged with having committed multiple counts of felony child sexual misconduct.

"Substantial Experience in the Practice of Law. The Respondent was admitted to the practice of law in the state of Kansas in 1988. At the time of the misconduct in this case, the Respondent had been practicing law for eleven years.

"Indifference to Making Restitution. The Respondent refuses to acknowledge that she owes any restitution to Mr. and Mrs. Curtis.

"Illegal Conduct. In this case, the Respondent 'padded' her bill and refused to refund unearned fees. This conduct is tantamount to the conversion of Mr. and Mrs. Curtis' property."

The panel found one mitigating circumstance: the letters submitted by the respondent from her friends and clients indicating the respondent enjoys a good reputation in her community.

In addition to the above factors, the hearing panel considered Standards 4.12, 5.11, 5.12, 7.2, and 8.2 of the ABA Standards for Imposing Lawyer Sanctions.

The panel then made the following recommendation:

### "RECOMMENDATION

"Based upon the findings of fact, conclusions of law, and factors in aggravation, as well as the standards cited above, the Hearing Panel unanimously recommends that Respondent be indefinitely suspended from the practice of law in the state of Kansas.

"Further, the Hearing Panel recommends that, in the event the Respondent applies for reinstatement, pursuant to Kan. Sup. Ct. R. 219, she be required to show that she has made appropriate restitution to Mr. and Mrs. Curtis, that she has a complete understanding of KRPC 1.15, and that she has acquired the management skills necessary to operate a law office."

Respondent filed no exceptions to the report of the hearing panel and failed to appear before this court at the time of scheduled oral argument. The Disciplinary Administrator's office recommends that the respondent be indefinitely suspended from the practice of law in Kansas. Based upon the record before us, we agree with and adopt the panel's conclusions and recommendations.

IT IS THEREFORE ORDERED that Kimberley K. Kellogg be and she is hereby indefinitely suspended from the practice of law in the state of Kansas, effective the date of this opinion.

IT IS FURTHER ORDERED that Kimberley K. Kellogg shall comply with Supreme Court Rule 218 (2001 Kan. Ct. R. Annot. 276) and that if she seeks reinstatement, she shall comply with Supreme Court Rule 219 (2001 Kan. Ct. R. Annot. 285).

IT IS FURTHER ORDERED that this opinion be published in the official Kansas Reports and that respondent pay the costs of these proceedings.